# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3111

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| David McIntyre, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 18, 2011
Filed: July 27, 2011

_____

Before SMITH, BRIGHT, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

David McIntyre conditionally pleaded guilty to knowingly and intentionally manufacturing and attempting to manufacture 100 or more marijuana plants, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1), reserving the right to appeal the district court's[1] denial of his motion to suppress. On appeal, McIntyre argues that the district court erroneously failed to suppress (1) a county attorney subpoena, (2) thermal imaging search warrants, and (3) a search warrant of his residence. We affirm.

_____

[1]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

## I. *Background*

On December 8, 2008, Nebraska State Patrol (NSP) Investigator Jason Sears and Nebraska State Trooper Lueders[2] contacted McIntyre outside of his residence in Fremont, Nebraska, investigating a missing-person case. McIntyre had purchased from a person of interest in that case a trailer, which might have been used to dispose of a vehicle. Investigator Sears questioned McIntyre about the trailer, and McIntyre invited the officers into his residence while he looked for the trailer's title. As Investigator Sears walked by the vehicle parked in the driveway, he noticed a pen tube in the ashtray, which he thought was a "tooter" used to ingest controlled substances. While inside the residence, Investigator Sears smelled a strong odor of raw marijuana, resulting in symptoms that he described as an allergic reaction to the odor. Investigator Sears also noted that McIntyre was visibly nervous when talking about the trailer, and McIntyre's hands shook as he handed the trailer title papers to Investigator Sears. McIntyre said that the trailer was loaded with wood and was either at his cabin in Crofton, Nebraska, or at Mark Narke's residence. McIntyre stated that he only visited his cabin one or two weekends per month. McIntyre called Narke and told him to take the trailer to Narke's residence in Santee, Nebraska, and unload the wood. He told Narke to have the trailer at the residence before NSP officers arrived. Inspector Sears overheard the telephone conversation between McIntyre and Narke.

Later that day, Investigator Sears and Trooper Lueders drove to Narke's residence and inspected the trailer. It was empty. Narke declared his ignorance of anything being loaded on the trailer. With Narke's permission, the officers inspected the trailer and the buildings on the property and found nothing unusual.

On January 9, 2009, at 7:00 a.m., Investigator Sears and Cedar County Sheriff Larry Koranda drove past McIntyre's Crofton residence to determine whether there was a garage at the residence, and, if so, whether the garage could hold a pickup

---

[2]Trooper Lueders's first name is not reported in the record.

truck—an object in the missing-person investigation. They saw an Oldsmobile backed up to a garage door. When they returned to the residence at 1:00 p.m., the Oldsmobile was gone. The officers viewed the garage. Investigator Sears noticed a hanging shingle on the garage, a small hose protruding from under the garage door, and a strong odor of raw marijuana near the garage. Again, the odor of the marijuana caused Investigator Sears to suffer symptoms that he described as an allergic reaction. Subsequently, Investigator Sears retrieved McIntyre's arrest record and found two prior drug-related arrests from 1981 and 2003.

Based upon the smell of raw marijuana and McIntyre's criminal history, Investigator Sears decided to obtain and examine McIntyre's electricity usage records. He called the Cedar-Knox Public Power District and asked General Manager Daniel Leise for the electricity usage records for the Crofton residence. Leise informed Investigator Sears that he needed a subpoena to obtain the records. NSP Investigator Douglas Kelley contacted the Knox County Attorney and obtained a county attorney's subpoena for electricity usage records for the Crofton residence. After Investigator Sears presented Leise with the subpoena, Leise gave Investigator Sears a single sheet of electrical usage for the past three years. The document showed a huge spike in electrical usage for November 2008. This apparent spike, however, was later shown to be inaccurate because the reported number actually reflected usage for November *and* December 2008. Leise told Investigator Sears that the usage seemed higher than that of neighboring properties and informed Investigator Sears that if further records were needed, Leise could obtain them. Investigator Sears made no further requests.

On January 14, 2009, Investigator Kelley applied for a thermal imaging warrant for the Crofton residence and submitted an affidavit in support of the warrant. In the search-warrant affidavit, Investigator Kelley cited Investigator Sears's allergic reaction to the smell of raw marijuana at both of McIntyre's residences, McIntyre's drug arrest history, the electrical usage record, the "tooter" observed in McIntyre's truck at the Fremont residence, and information about the use of thermal imaging in locating

marijuana-growing operations. A Knox County judge issued the thermal imaging warrant the same day. That evening, Investigator Kelley executed the warrant. The warrant was returned to the court with a recording of thermal imagery showing more electrical usage in the garage than in the living areas of the Crofton residence.

On January 15, 2009, Investigator Kelley sought and obtained a second thermal imaging warrant for the Crofton residence. According to Investigator Kelley, he obtained the second warrant to compare readings from other residences in the area. Investigator Kelley testified that he told the issuing Knox County judge that he intended to obtain information from nearby homes for comparison purposes but did not include that information in the affidavit. This warrant was executed and returned with a recording of thermal imagery showing that greater heat was generated in the living areas in the neighboring residences than their accompanying garages.

Based on the information set forth in the thermal imaging search-warrant affidavits and the thermal imagery obtained as a result of the warrants, on January 16, 2009, Investigator Kelley sought and obtained a search warrant for the Crofton residence. In executing the warrant, officers discovered a marijuana-growing operation and seized it. That same day, a search warrant was also issued for McIntyre's Fremont residence, but officers found no evidence of illegality.

## II. *Discussion*

On appeal, McIntyre asserts that the district court erred by not suppressing (1) the county attorney subpoena, (2) thermal imaging search warrants, and (3) a search warrant of his Crofton residence.

"On appeal of a motion to suppress, we review the district court's legal conclusions *de novo* and factual findings for clear error." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011).

A. *County Attorney Subpoena*

McIntyre argues that the district court erred in not suppressing the subpoena *duces tecum* by which the NSP received electricity usage records for the Crofton residence. According to McIntyre, he had an expectation of privacy in those records because they contained intimate details about the interior of his home. Consequently, he maintains that investigators should have obtained these records via a search warrant. Additionally, McIntyre contends that he has a state statutorily-protected privacy interest in the electrical usage at his residence.

1. *Reasonable Expectation of Privacy*

"The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 211 (1986) (quotation and citation omitted). The Supreme Court

> has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*United States v. Miller*, 425 U.S. 435, 443 (1976) (holding that bank depositer has no legitimate expectation of privacy in copies of checks and deposit slips retained by his bank); *cf. Couch v. United States*, 409 U.S. 322, 335 (1973) ("[T]here can be little expectation of privacy where records are handed to an accountant, knowing that mandatory disclosure of much of the information therein is required in an income tax return."); *Smith v. Maryland*, 442 U.S. 735, 744 (1979) (holding that "[w]hen [defendant] used his phone, [he] voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business").

Here, Investigator Sears served the Cedar-Knox Public Power District—a third party—with the county attorney subpoena. "Because it is well-settled that 'the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities[,]' [McIntyre's] claim[] fail[s]." *United States v. Hamilton*, 434 F. Supp. 2d 974, 979 (D. Or. 2006) (holding defendant lacked reasonable expectation of privacy in his utility records, meaning law enforcement officer did not need probable cause to obtain records because information contained in the records was voluntarily revealed by defendant to utility company, a third-party recipient) (quoting *Miller*, 425 U.S. at 443).

> But McIntyre

> argues that power records are different. He relies on *Kyllo v. United States*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) for the proposition that a person has a reasonable expectation of privacy in his power records because the information from the records is legally indistinguishable from the power information protected by the Fourth Amendment in *Kyllo*.

*Id.* at 980. We reject McIntyre's argument and conclude that

> [t]he manner in which the information was obtained in *Kyllo* (a thermal-imaging device), however, bears no resemblance to obtaining power data from a third party by way of [a county attorney] subpoena. Crucial to the *Kyllo* holding was the intrusion on the home by "sense-enhancing technology . . . not in general public use." *Id.* at 34, 121 S. Ct. 2038. Thus, while the information obtained may be similar, the means to obtaining the information is legally significant and defeats [McIntyre's] argument. Instead, *Smith v. Maryland*, a case in the *Miller* line, is on point. There the court held that "[w]hen [defendant] used his phone, [he] voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business" and therefore did not have an objectively reasonable

expectation of privacy in that information. *Smith*, 442 U.S. at 744, 99 S. Ct. 2577. Similarly, when [McIntyre] used power in his home, he voluntarily conveyed that information to [Cedar-Knox Public Power District]. As a result, he had no reasonable expectation of privacy in his power records.

*Id.*; *see also United States v. Porco*, 842 F. Supp. 1393, 1398 (D. Wyo. 1994) (rejecting defendants' argument that "they had an expectation of privacy in the records of their electrical usage kept by Rural Electric because Rural Electric would not voluntarily disclose a person's electric usage" because "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by the third party to government authorities, even if the information is revealed to the third party confidentially and on the assumption that it will be used only for limited purposes"); *Samson v. State*, 919 P.2d 171, 173 (Alaska Ct. App. 1996) (finding no reasonable expectation of privacy in power consumption utility records).

### 2. *State Statutorily-Protected Privacy Interest*

Additionally, McIntyre argues that he has a statutorily-protected privacy interest in his electrical usage at his Crofton residence under Nebraska Revised Statute § 70-101. According to McIntyre, authorities also "breached the very process [they] cited as authority in [their] efforts to obtain the records"—Nebraska Revised Statute § 25-1273. He argues that the government failed to demonstrate that any of the discovery rules authorized discovery from a nonparty in this case, as required by § 25-1273.[3]

---

[3]Section 25-1273 provides:

When the discovery rules promulgated by the Supreme Court authorize discovery from a nonparty without a deposition, a subpoena shall be issued by the clerk of the court before whom the action is pending upon request of a party. An attorney as an officer of the court may also issue and sign such a subpoena on behalf of a court in which the attorney is authorized to practice. The subpoena shall be served in the time and manner required by the discovery rules. Such discovery rules shall not

And, he contends that, while the subpoena claims that Nebraska Rule of Civil Discovery 34A grants the issuing county attorney the "authority" to issue it, the rule applies to *civil* cases, not criminal cases.

Here, Knox County Attorney John Thomas issued the subpoena *duces tecum*, under the purported authority of § 25-1273, commanding Cedar-Knox Public Power District to provide "[a] true and complete copy of all *electricity usage records and reports*" for the Crofton residence. (Emphasis added.) McIntyre argues that he has a statutorily-protected interest in these usage records under § 70-101, which provides:

> Notwithstanding any other provision of law regarding confidentiality of records, every district or corporation organized under Chapter 70 shall, upon request, furnish to any county attorney, any authorized attorney as defined in section 42-347, or the Department of Health and Human Services *a utility service subscriber's name, social security number, and mailing and residence addresses only for the purposes of establishing and collecting child, spousal, and medical support and of conducting reviews under sections 43-512.12 to 43-512.18.* Such information shall be used for no other purpose. An action may be filed in district court to enforce this section. For purposes of this section, utility service shall mean electrical, gas, water, telephone, garbage disposal, or waste disposal service.

(Emphasis added.)

As the district court explained, McIntyre's "argument that § 70-101 provides an expectation of privacy by restricting the dissemination to the county attorney of utility subscriber information is deficient *because that statute relates only to identifying information and not to usage records*." *United States v. McIntyre*, 683 F. Supp. 2d

---

be construed to permit discovery by subpoena if the information is protected by statute or if that procedure conflicts with any other statute.

-8-

1020, 1026 (D. Neb. 2010) (emphasis added). Therefore, we conclude that McIntyre's Fourth Amendment rights were not violated by law enforcement's use of the subpoena, and a search warrant was unnecessary to obtain the usage records.

We also reject McIntyre's argument that the subpoena was deficient because it was not served in compliance with § 25-1273 or Nebraska Rule of Civil Discovery 34A. As the district court explained, "[regardless of these issues, the county attorney has subpoena power, under the circumstances present here, pursuant to Neb. Rev. Stat. § 86-2,112." *Id*. at 1033. Section 86-2, 112 states that "any county attorney may . . . require the production of records . . . which constitute or contain evidence relevant or material to the investigation or enforcement of the laws of this state when it reasonably appears that such action is necessary and proper."

And, even if state law was violated, "state law violations do not necessarily offend the Federal Constitution." *United States v. Burtton*, 599 F.3d 823, 828 (8th Cir. 2010) (quotation and citation omitted). "Thus, when a federal court must decide whether to exclude evidence obtained through an arrest, search, or seizure by state officers, the appropriate inquiry is whether the arrest, search, or seizure violated the Federal Constitution, not whether the arrest, search, or seizure violated state law." *Id*. (quotation and citation omitted). For the reasons set forth *supra* in Part A.1, we hold that no Fourth Amendment violation occurred.

## B. *Thermal Imaging Search Warrants*

McIntyre also argues that the district court erred in denying his motion to suppress the thermal imaging search warrants and request for a *Franks*[4] hearing because the one-page utility record that Investigator Sears received and referenced in his supporting affidavit contained false information, as it improperly combined electrical usage for November and December 2008 and referred to that sum as only

---

[4]*Franks v. Delaware*, 438 U.S. 154 (1978).

electrical usage for November 2008. According to McIntyre, this fact alone should have entitled him to a *Franks* hearing to determine the search warrant's veracity. He also asserts that Investigator Kelley falsely indicated in his supporting affidavit that he had obtained "records" and "reports" regarding McIntyre's utility usage when, in fact, he had only obtained a one-page report. McIntyre contends that this false information constitutes a misrepresentation that should have entitled him to a *Franks* hearing. According to McIntyre, once the false information is omitted from the affidavit, the remaining portions of the affidavit do not establish probable cause.

"We review the denial of a *Franks* hearing for abuse of discretion." *United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir. 2009) (en banc) (per curiam).

> To obtain relief under *Franks*, "a defendant must first demonstrate that the law enforcement official deliberately or recklessly included a false statement, or omitted a truthful statement from his warrant affidavit." *United States v. Carpenter*, 422 F.3d 738, 745 (8th Cir. 2005) (citation omitted). Next, the defendant must show that the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented. *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001). *Allegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood.* *Franks*, 438 U.S. at 171, 98 S. Ct. 2674; *United States v. Davis*, 471 F.3d 938, 946 (8th Cir. 2006). Recklessness, however, may be "inferred from the fact of omission of information from an affidavit . . . when the material omitted would have been 'clearly critical' to the finding of probable cause." *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986) (citation omitted).

*United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010) (emphasis added). In determining if "an affiant's statements were made with reckless disregard for the truth," the test "is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Butler*, 594 F.3d

955, 961 (8th Cir. 2010). "A showing of deliberate or reckless falsehood is not lightly met." *Id*. (quotation and citation omitted).

Here, the alleged falsehoods "do not meet the 'substantial preliminary showing' required by *Franks*." *United States v. Crissler*, 539 F.3d 831, 834 (8th Cir. 2008). First, as to the utility record's inaccurate accounting of the November 2008 usage, there is no evidence to support a finding that Investigator Sears and Investigator Kelley had reason to believe or knew that the report that Cedar-Knox Public Power District provided to them erroneously combined November 2008 and December 2008 usage. McIntyre has failed to show that the investigators "had obvious reasons to doubt the accuracy of the information" that the public utility company provided to them. *Butler*, 594 F.3d at 961.

Second, as to Investigator Kelley's reference to "reports" and records" in the affidavit when, in fact, he only had a one-page report, to the extent that this statement is inaccurate, there is no evidence that Investigator Kelley deliberately or recklessly made the statement or that the statement was material. *See Mashek*, 606 F.3d at 928. The number of documents or pages in the utility usage report mattered little to the merit of the affidavit. Furthermore, the one-page report that the Cedar-Knox Public Power District provided was *a summation of over three years* of kilowatt usage.

Therefore, we hold that the district court did not err in failing to grant McIntyre's request for a *Franks* hearing and accordingly need not address whether the remaining portions of the supporting affidavit would support a probable cause finding. *United States v. Curry*, 911 F.2d 72, 76 (8th Cir. 1990) ("We need not address this second issue because, with respect to both alleged falsehoods, [the defendant's] offers of proof were insufficient to meet the first *Franks* requirement.").

## C. *Crofton Residence Search Warrant*

Finally, McIntyre argues that the search warrant for his Crofton residence is "fruit of the poisonous tree" stemming from the county attorney subpoena and thermal imaging warrants. According to McIntyre, "[t]he affidavit and resulting search warrant for the Crofton residence was the culmination of the subpoena for electrical records and the thermal warrants. Removing or excising either of the proceeding [sic] investigative tools defeats the crescendo of probable cause established by the previous warrants and/or subpoena."

McIntyre's assertion that the district court erred by declining to suppress the search warrant of his Crofton residence is based on his arguments that the district court should have suppressed the county attorney subpoena and thermal imaging search warrants. Because we have already rejected these arguments, *see supra* Parts A–B, his "'fruit of the poisonous tree' argument fails." *See United States v. Martinez*, 462 F.3d 903, 910 (8th Cir. 2006).

And, our independent review of the record confirms that the search warrant for the Crofton residence was supported by probable cause.

> "Our role is to ensure that the evidence as a whole provides a substantial basis for finding probable cause to support the issuance of the search warrant" for [McIntyre's] residence. *United States v. Terry*, 305 F.3d 818, 822 (8th Cir. 2002). "Whether probable cause . . . has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge 'should be paid great deference by reviewing courts.'" *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007), *cert. denied*, ___U.S. ___, 128 S. Ct. 1704, 170 L. Ed. 2d 516 (2008) (*quoting Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). "When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists." *Terry*, 305 F.3d at 822. "Accordingly, we examine the sufficiency of a search-warrant affidavit using a

'common sense' and not a 'hypertechnical' approach." *Grant*, 490 F.3d at 632 (*quoting United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)).

*United States v. McArthur*, 573 F.3d 608, 613 (8th Cir. 2009).

Here, considering the totality of the circumstances, probable cause existed to issue the search warrant for the Crofton residence. First, the supporting affidavit set forth Investigator Sears's encounter with McIntyre on December 8, 2008, at the Fremont residence where Investigator Sears saw a pen tube—a "tooter" believed to be used to ingest controlled substances—in the ash tray of McIntyre's vehicle. While at the Fremont residence, Investigator Sears observed McIntyre's unusual and extremely nervous behavior and smelled raw marijuana at the residence. Second, the affidavit reported that on January 9, 2009, Investigator Sears smelled a strong odor of raw marijuana outside the garage of the Crofton residence and saw a small hose coming out from under the garage door. Third, the affidavit recounts Investigator Kelley's discovery of McIntyre's previous drug arrests. Fourth, the affidavit explains that Investigator Sears obtained the electricity usage records for the Crofton residence, which was "unusually high for [a] person that lived at the residence continuously." Finally, the affidavit recounts Investigator Kelley's knowledge, from training and experience, that "thermal imagery i[s] an investigative tool used by law enforcement to assist in the detection of indoor marijuana grow operations, whereas grow operations produce large amounts of heat from the grow lights." The affidavit then explains that the two thermal imagery readings of the Crofton residence showed, respectively, a higher heat signature emanating from the garage area than from the living quarters of the home and from comparable residences in McIntyre's neighborhood.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____